**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PRINCEWILL ARINZE DURU,** | : | |
| **Petitioner** | : | **No. 1:24-cv-01362** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **J. GREENE, WARDEN FCI** | : | |
| **ALLENWOOD,** | : | |
| **Respondent** | : | |

**MEMORANDUM**

Currently before the Court is pro se Petitioner Princewill Arinze Duru ("Duru")'s petition for a writ of habeas corpus under 28 U.S.C. § 2241 in which he challenges disciplinary sanctions imposed by a Burean of Prisons ("BOP") disciplinary hearing officer ("DHO") while he was incarcerated at Federal Correctional Institution Allenwood Low ("FCI Allenwood Low"). For the reasons stated below, the Court will deny the petition.

## I. BACKGROUND

### A. Duru's Convictions, Sentence, Place of Confinement, and Projected Release Date

Duru is currently serving an aggregate term of eighty-one months' imprisonment to be followed by three years of supervised release after a jury sitting in the United States District Court for the Central District of California found him guilty of conspiracy to engage in money laundering (18 U.S.C. § 1956(h)), conspiracy to commit wire fraud (18 U.S.C. § 1349), wire fraud and aiding and abetting (18 U.S.C. §§ 2(a), 1343), and aggravated identity theft and aiding and abetting (18 U.S.C. §§ 2, 1028A). See United States v. Duru, No. 19-cr-00380-58 (C.D. Cal. filed May 31, 2019) ("Duru"), ECF No. 1450.[1] Although Duru appealed from his convictions

[1] The Court takes judicial notice of the docket in Duru's underlying criminal case. See Orabi v. Att'y Gen. of the U.S., 738 F.3d 535, 537 n.1 (3rd Cir. 2014) (stating that the court "may take

and sentence to the Ninth Circuit Court of Appeals, see id., ECF No. 1452, the Ninth Circuit issued an unpublished decision affirming his judgment on May 15, 2025. See id., ECF No. 1553; United States v. Egwumba, Nos. 22-50272, 22-50274, 2025 WL 1409495 (9th Cir. May 15, 2025) (unpublished), cert. denied sub nom. Duru v. United States, 146 S.Ct. 1660 (2026), reh'g denied, No. 25-796, 2026 WL 1052003 (Apr. 20, 2026). Duru is currently incarcerated at FCI Allenwood Low and has, according to the Federal Bureau of Prisons ("BOP") inmate locator (https://www.bop.gov/inmateloc/), an anticipated release date of January 14, 2027.

### B. Procedural History

Duru commenced the instant action by filing his Section 2241 habeas petition, which the Clerk of Court docketed on August 13, 2024.[2] (Doc. No. 1.) In his petition, Duru challenges disciplinary sanctions which included, inter alia, the loss of good conduct time ("GCT"), imposed upon him after the DHO determined that he engaged in a group demonstration in violation of BOP Code 212. (Id. at 2; Doc. No. 1-1 at 12–14.)

Duru raises four challenges to his disciplinary proceedings in the petition. See (Doc. No. 1 at 6–7). First, he asserts that prison officials intentionally ignored video footage of the November 30, 2023 incident. See (id. at 6). Second, he alleges that an "Officer Thomas" from FCI Allenwood Low "is a fictitious and false witness." See (id.). Third, he contends that his

---

judicial notice of the contents of another [c]ourt's docket"); Wilson v. McVey, 579 F. Supp. 2d 685, 688 n.5 (M.D. Pa. 2008) (taking judicial notice of court docket). That docket shows that Duru's criminal proceedings were initiated by criminal complaint on May 31, 2019, and the grand jury returned an indictment on June 27, 2019. See Duru, ECF Nos. 1, 30.

[2] Duru neither remitted the filing fee nor sought leave to proceed in forma pauperis when he filed his petition; as such, two Administrative Orders issued, each of which provided him with a period of thirty days to pay the filing fee or apply for leave to proceed in forma pauperis. (Doc. Nos. 3, 4.) In response to the second Administrative Order, Duru timely paid the fee. See (Unnumbered Docket Entry Between Doc. Nos. 4 and 5).

sanctions unfairly restricted his access to his counsel assisting him with his direct appeal. See (id.). Fourth, and finally, he complains that he was denied a courtesy phone call after learning that his father had passed away, and he was injured by a zip-tie which was used on him during the November 30, 2023 incident. See (id. at 7). For relief, Duru seeks to have his incident report expunged, his lost privileges restored, his eighty-one (81) days of good conduct time returned, and "any additional compensation that is considered reasonable for the injustice." See (id.).

On May 6, 2025, the Court issued an order which, inter alia, directed Respondent to file a response to Duru's Section 2241 petition and dismissed Duru's claims challenging the imposition of sanctions in the nature of the loss of telephone, commissary, visitation, and "email and Trulinc Functions" for one year, as well as his placement in the SHU for forty-five days, without prejudice to him asserting them in a civil rights action if he decides to do so. See (Doc. No. 5 at 5.) Respondent timely filed a response in opposition to the petition along with various exhibits on May 27, 2025. (Doc. No. 7.) Duru filed a reply brief in further support of his petition, which the Clerk of Court docketed on June 24, 2025. Duru's petition is ripe for disposition.

### C. The BOP's Administrative Process in Inmate Disciplinary Cases[3]

The BOP has enacted specific procedures for disciplinary proceedings. See 28 C.F.R. §§ 541.1–.8. Under these procedures, a staff member charges a prisoner with committing a prohibited act by issuing an incident report. See id. § 541.5(a) ("The discipline process starts when staff witness or reasonably believe that you committed a prohibited act. A staff member will issue you an incident report describing the incident and the prohibited act(s) you are charged

---

[3] To provide more context to the Court's recitation of Duru's relevant disciplinary proceedings at FCI Allenwood Low, the Court will first set forth the BOP's procedures for such proceedings.

with committing."). The incident report ordinarily must be issued within twenty-four hours of the time the staff member became aware of the prisoner's involvement in the incident. See id. (stating that inmates "will ordinarily receive the incident report within 24 hours of staff becoming aware of [the inmate's] involvement in the incident"). The incident is then investigated by a staff member. See id. § 541.5(b) (indicating that "[a]fter [the inmate] receives an incident report, a [BOP] staff member will investigate it").

After the BOP staff member investigates the incident, the correctional facility's Unit Discipline Committee ("UDC") reviews the incident report and takes one of the following actions: (1) finds that the prisoner "committed the prohibited act(s) charged[] and/or a similar prohibited act[] as described in the incident report"; (2) finds that the prisoner "did not commit the prohibited act(s) charged"; or (3) refers the incident report to a DHO for further review. See id. § 541.7(a)(1)–(3). Prohibited acts are separated into four categories based on severity: Greatest, High, Moderate, and Low. See id. § 541.3(a). If a prisoner is charged with a prohibited act in the Greatest or High severity category, the UDC automatically refers the incident report to the DHO for further review. See id. § 541.7(a)(4).

When an incident report is referred to the DHO, a disciplinary hearing is conducted in accordance with the procedures set forth at 28 C.F.R. § 541.8. Pursuant to these procedures, the prisoner is entitled to notice of the charges at least twenty-four hours before the hearing. See id. at § 541.8(c) (stating that the prisoner "will receive written notice of the charge(s) against [them] at least 24 hours before the DHO's hearing" and explaining that they "may waive this requirement, in which case the DHO's hearing can be conducted sooner"). The prisoner is entitled to appear at the hearing and have staff representation at the hearing. See id. at § 541.8(d), (e). The prisoner is also "entitled to make a statement and to present documentary

evidence to the DHO on [their] own behalf." See id. § 541.8(f). A prisoner may request to have witnesses appear "before the DHO either in person or electronically" at the hearing on their behalf. See id. § 541.8(f)(1). However, the DHO may refuse to call requested witnesses if "they are not reasonably available, their presence at the hearing would jeopardize institutional security, or they would present repetitive evidence." See id. § 541.8(f)(3).

When rendering a decision on an incident report, the DHO considers "all evidence presented during the hearing." See id. § 541.8(f). The decision of the DHO must be "based on at least some facts and, if there is conflicting evidence, on the greater weight of the evidence." See id. (emphasis added). Following the hearing, the DHO must provide a written report documenting (1) whether the prisoner was advised of their rights, (2) the evidence relied upon by the DHO, (3) the DHO's decision, (4) the sanctions imposed by the DHO, and (5) the reasons of the DHO for imposing those sanctions. See id. § 541.8(h)(1)–(5).

A prisoner dissatisfied with the DHO's decision "may appeal the [decision] through the Administrative Remedy Program, 28 CFR part 542, subpart B." See id. § 541.8(i). Pursuant to the Administrative Remedy Program, a prisoner may file an appeal from the DHO's decision to the Regional Director for the region where the prisoner is currently confined within twenty calendar days of the DHO's decision. See id. § 542.15(a). The Regional Director then has thirty calendar days to respond to the appeal. See id. § 542.18. If the prisoner is dissatisfied with the Regional Director's response, that decision may be appealed to the BOP's General Counsel at the BOP's Central Office within thirty calendar days from the date of the Regional Director's

response. See id. § 542.15(a). General Counsel then has forty calendar days to respond to the appeal. See id. § 542.18.[4]

### D. Duru's Disciplinary Proceedings

While Duru was incarcerated at FCI Allenwood Low, he was the subject of an incident report dated November 30, 2023 (No. 3860357) charging him with engaging in a group demonstration in violation of BOP Code 212, refusing work/program assignment in violation of BOP Code 306, refusing to obey an order in violation of BOP Code 307, and being unsanitary or untidy in violation of BOP Code 330. See (Doc. Nos. 1-1 at 9; 7-4 at 2). The incident report describes these charges as follows:

> On November 30, 2023, at approximately 6:00 AM the Union B Housing Unit Officer distributed the breakfast meals to the inmates in Union B. After completing the feeding, the Housing Unit Officer observed several inmates engaging in a group demonstration by leaving their assigned cubes and discarding the breakfast meal onto the floor at the beginning of both ranges. Currently LSCI Allenwood is under a lockdown status and all inmates are to remain within their assigned cubes with the exception of the use of the bathrooms. The Housing Unit Officer was able to identify several of the inmates that participated in this demonstration via the inmates [sic] Picture Identification Card. Inmate Duru, Princewill Reg. No. 78392-097 was identified as one of the participants.

See (Doc. Nos. 1-1 at 9; 7-4 at 2).

On the same date as the issuance of the incident report, prison officials provided Duru with notice of the incident report, a copy of the incident report, and advised him of his right to remain silent. See (Doc. No. 7-4 at 2, 4). A prison official also conducted an investigation into

---

[4] "No administrative grievance is considered to have been fully and finally exhausted until denied by the [BOP's] Central Office." Sharpe v. Costello, 289 F. App'x 475, 478 (3d Cir. 2008) (unpublished) (citing 28 C.F.R. § 542.15(a)). However, a prisoner may consider the lack of a timely response to their administrative remedy or appeal as a denial. See 28 C.F.R. § 542.18 (providing that if "the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level").

the incident during which they noted that Duru, inter alia: (1) "chose NOT to provide a statement" to investigators; (2) "displayed a POOR attitude during th[e] investigation"; (3) "chose NOT to request a witness during the investigation"; and (4) "DID NOT request Video or Audio Evidence." See (id. at 4). Based on this investigation, the investigator concluded that the charges were supported by the evidence and forwarded Duru's incident report to FCI Allenwood's Unit Disciplinary Committee ("UDC"). See (id.). The UDC later referred Duru's charges to the DHU for a hearing. See (id. at 3; Doc. No. 1-1 at 10).

On December 2, 2023, Duru was issued a Notice of Disciplinary Hearing before the DHO and was advised of his rights to, inter alia, "have a full-time staff member represent [him] at the hearing" and "call witnesses at the hearing and . . . present documentary evidence on his behalf." See (Doc. No. 7-6 at 1). This Notice indicates that Duru declined to have witnesses at the hearing and did not want to have a staff representative at the hearing. See (id.).[5] Additionally, Duru received an Inmate Rights at Discipline Hearing form, which set forth the rights afforded to him at his DHO hearing. See (Doc. No. 7-7 at 1).[6]

On December 7, 2023, the DHO held a hearing, after which they issued a written report finding that Duru violated Code 212. See (Doc. Nos. 1-1 at 11, 13; 7-8 at 1, 3). The DHO noted in their report that Duru denied the charge and waived the right to have witnesses. See (Doc. Nos. 1-1 at 12, 13; 7-8 at 2, 3). The DHO also indicated that Duru stated during the hearing: "I was not there, I did not do that. I was in my cube, I went to the bathroom and came back, that's all." See (Doc. Nos. 1-1 at 11; 7-8 at 2).

---

[5] The notice indicates that Duru refused to sign it. See (id.).

[6] The form indicates that Duru also refused to sign it. See (id.).

Despite Duru's statement and denial of the charges, the DHO concluded that he violated Code 212. See (Doc. Nos. 1-1 at 12–13; 7-8 at 2–3). The "specific evidence relied on to support the DHO's findings" is set forth in the DHO's written report as follows:

> Your due process rights were read and reviewed with you by the DHO at the time of this hearing. You stated that you understood your rights. You stated that you had no documentary evidence to present to the DHO. You did not request to have a staff representative and you did not request any witnesses. The DHO dropped codes 306, 307, and 330.
>
> The DHO finds that you committed the prohibited act of encouraging or engaging in a group demonstration, Code212 [sic]. The specific evidence relied upon in this case were the numerous memorandums corroborating the incident report. The photograph's [sic] of the food on the floor corroborating the incident report. The written account of the reporting staff member which states[:] "On November 30, 2023, at approximately 6:00 AM the Union B Housing Unit Officer distributed the breakfast meals to the inmates in Union B. After completing the feeding, the Housing Unit Officer observed several inmates engaging in a group demonstration by leaving their assigned cubes and discarding the breakfast meal onto the floor at the beginning of both ranges. Currently LSCI Allenwood is under a lockdown status and all inmates are to remain within their assigned cubes with the exception of the use of the bathrooms. The Housing Unit Officer was able to identify several of the inmates that participated in this demonstration via the inmates Picture Identification Card. Inmate Duru, Princewill Reg. No. 78392-097 was identified as one of the participants."
>
> The DHO read the incident report aloud to you. You stated: "I was not there, I did not do that. I was in my cube, I went to the bathroom and came back, that's all."
>
> The DHO considered your statements and defense, some facts and the evidence presented. The DHO concludes[:] The institution was on "lock down" status and no inmates were authorized to leave their assigned areas with the exception of using the bathroom. The reason for the lockdown was due to inmates attempting to carry out a hunger/food strike stemming from approximately ten percent of the inmate population attending lunch at mainline on November 29th, 2023. This was done because the inmates did not agree with the administrations [sic] recent management changes to procedures affecting the inmate population. The following morning on November 30th, 2023 inmates were served their morning meals in the housing unit. Officer Thomas was the assigned housing unit officer working in that unit when a large number of inmates vacated their assigned areas, walked to the beginning of the range and discarded their meals onto the range floor. There are photographs showing this and Officer Thomas provided a signed memorandum stating that he observed you as one of the inmates involved in this demonstration by depositing your breakfast onto the floor with a large group of other inmates. Lt. Stover

> provided a signed memorandum showing that he conducted a review of the video system which was inconclusive due to the lack of lighting in the housing unit during that time period. Therefore[,] the DHO relied upon the officer's eyewitness account of the incident. You denied doing this and stated that you instead used the bathroom. You provided no evidence to support your statement[,] and the DHO does not believe that to be the case. The DHO believes that Officer Thomas is competent and can discern between someone using the bathroom and someone dumping food onto the range. During the course of conducting hearings with other inmates involved in this incident who were charged with the same offense, the DHO was told that other inmates were instructing them to not eat their food and instead leave their areas and dump the food on the ground at the beginning of the ranges. If you disagree with the terms of your incarceration or are not satisfied with the accommodations provided to you, you can file an administrative remedy. Engaging in a large scale[-]group demonstration is not a viable option. Other than asserting that you were not engaged in a group demonstration, you failed to provide the DHO with any substantive evidence to support that you did not commit this act. Encouraging or engaging in a group demonstration is prohibited and will not be tolerated.
>
> Based on the above, the DHO finds the greater weight of evidence presented shows that you committed the prohibited act of encouraging or engaging in a group demonstration, code 212.

See (Doc. Nos. 1-1 at 12–13; 7-8 at 3–4).

As noted in the DHO's report, the DHO relied upon two signed memoranda to support their decision: one from Officer Thomas and the other from Lt. Stover. See (Doc. Nos. 1-1 at 13; 7-8 at 4). Officer Thomas's memorandum, which was partially redacted to protect the names of other inmates involved in the incident states:

> AM, I witnessed the following 14 inmates throwing their meals to the front of the range: . . . Duru, #78392-097 . . . . I instructed all the above stated inmates that I was affording them the opportunity to eat, and if they did not want their trays to dispose of their food in the garbage.

See (Doc. No. 7-9 at 1). As for Lt. Stover's memorandum, it states as follows:

> On November 29, 2023, at approximately 10:54 a.m., the Operations Lieutenant was informed of a possible food strike at LSCI Allenwood. Specifically, once mainline was opened, approximately 100 inmates out of a compound population of 965 arrived to mainline. A recall of the LSCI was conducted at 11:10 a.m. and an emergency count was conducted immediately after. SIS staff, along with additional staff, reported to the LSCI to conduct mass interviews. LSCI Allenwood was placed under lockdown operations by the Warden due to the inmate food strike.

> On November 30, 2023, at approximately 6:00 AM the Union B Housing Unit Officer distributed the breakfast meals to the inmates in Union B. After completing the feeding, the Housing Unit Officer observed several inmates engaging in a group demonstration by leaving their assigned cubes and discarding the breakfast meal onto the floor at the beginning of both ranges. Currently LSCI Allenwood is under a lockdown status and all inmates are to remain within their assigned cubes apart from the use of the bathrooms. The Housing Unit Officer was able to identify several of the inmates that participated in this demonstration via the inmates Picture Identification Card. A review of VMS camera footage was conducted. The VMS footage was inconclusive due to lack of lighting within the unit at that time.
>
> The footage yielded no assistance with positively identifying more individuals that may have been involved with the group demonstration. All participants that were identified were placed into the Special Housing Unit without further incident.

See (Doc. No. 7-5 at 2).

Based on the two memoranda and the DHO's other findings, they imposed the following sanctions: (1) loss of twenty-seven days of GCT; (2) forty-five days of disciplinary segregation; (3) forfeiture of fifty-four days of non-vested GCT; and (4) loss of commissary, telephone, visit, and "other" privileges for one year. See (Doc. Nos. 1-1 at 13; 7-8 at 4). The DHO set forth the reasons for these sanctions in their written report:

> The action/behavior on the part of any inmate to encourage or engage in a group demonstration is considered disruptive to the orderly operation and security of the institution. This type of action/behavior cannot and will not be tolerated at any time. The sanction(s) imposed by the DHO were taken to let the inmate know that he, and he alone, will be held responsible for his actions/behavior at all times.
>
> The disallowance of good conduct time was [i]mposed to comply with mandatory sentencing guidelines for PLRA inmates. Placing you in disciplinary segregation was imposed as a penalty for wrongdoing. The forfeiture of non-vested good conduct time was imposed to demonstrate that if you violate the rules and policies of the institution, you will prolong your incarceration. The loss of phone, commissary, visits and other (ALL TRULINCS FUNCTIONS) sanctions were imposed to deter misconduct.

See (Doc. Nos. 1-1 at 13–14; 7-8 at 4–5).

Duru timely appealed from the DHO's decision to the Regional Director. See (Doc. Nos. 1-1 at 7; 7-11 at 13). In his appeal, Duru complained that:

> This is in regards to the incident report and a DHO report that was issued to me, in violation of Code 212 of the institution. I want to state for the record that I did not commit the said act and I have no reason to behave in such a manner. The cameras will bare [sic] me witness. It is extremely unjust to declare such a severe punishment on me and my family on a false verdict with no evidence to back the claim of my involvement and no consideration of my own account.
>
> The unit team have refused to give me a copy of a BP 10 despite many requests. I got this copy from an inmate. I gave my copy of the DHO report to a staff [sic] to make copies since last week. I will mail it in as soon as I get it. Attachments enclosed.

See (Doc. Nos. 1-1 at 7; 7-11 at 13, 14 (cleaned up)). Although somewhat unclear,[7] it appears that Duru attached a copy of a letter to his appeal form, which stated as follows:

> On November 30th, I was awaken [sic] by the movement of people. Then I noticed people fondling with the food boxes that was [sic] left on the [l]ockers while inmates were asleep. I went to brush my teeth and freshen up to avoid the rush later, because our showers had been turned off the day before. Some other people were doing the same thing. I went back to my cubicle and noticed that someone/people went around and gathered the boxes and left them at the beginning of the range. I went back to bed after I asked my cellmate if it was him that took our food away. He said no, it wasn't him. I went back to bed and never left again, until we were called for linen exchange. This was after twelve other inmates had been taken already. I and my cellmate were taken immediately[.] We went back to our cube to make our beds.
>
> I still don't know who Officer Thomas is.
>
> We were kept outside in cages like animals in a near freezing temperature for hours, left to freeze out with no one properly clothed for such weather, and some in shorts and t-shirts.

---

[7] Duru indicates on his appeal form that he attached documents to it. See (Doc. Nos. 1-1 at 7; 7-11 at 13, 14). However, the letter is dated December 24, 2023, see (Doc. Nos. 1-1 at 8; 7-11 at 15), whereas Duru appears to have dated his appeal form on December 20, 2023. See (Doc. Nos. 1-1 at 7; 7-11 at 13, 14). As such, it is unclear that this letter is one of the attachments Duru mentioned on his appeal form. Nevertheless, since both parties have included the letter along with Duru's appeal to the Regional Director, the Court considers it as having been attached to Duru's appeal form.

> I complained to two medical staff, but I'm [sic] yet to get any medical attention for the injury I sustained from the zip-tie that was used on me.
>
> I still feel the numb and shocking sensation on my hands. Especially my thumbs.
>
> DHO's decision: (1) One year no phone[;] (2) One year no visit[;] (3) One year no commissary[;] (4) One year no email or Trulincs Services[;] (5) 27 good days[;] (6) 54 non-vested good days[;] and (7) 45 days in the SHU; starting from the day the decision was made.

See (Doc. Nos. 1-1 at 8; 7-11 at 15).

On February 26, 2024, the Regional Director issued a decision affirming the DHO's findings and sanctions. See (Doc. Nos. 1-1 at 6; 7-11 at 8). The Regional Director's Response stated:

> You appeal the December 7, 2023 decision of the [DHO] at LSCI Allenwood finding you committed the prohibited act of Engaging in or Encouraging a Group Demonstration, Code 212, Incident Report No. 3860357. You deny committing the prohibited act, and list multiple issues which you contend support your request for the Incident Report to be expunged.
>
> The DHO reasonably determined you committed the prohibited act based on section 11 of the Incident Report and supporting evidence. A review of the disciplinary proceedings revealed no due process concerns or deviations from policy. Section 11 of the Incident Report contains sufficient notice of the charge and allowed you to prepare a defense. The record reflects the DHO afforded you the opportunity to present evidence and provide a statement in your defense. The DHO considered your statement prior to rendering a decision.
>
> The record in this case reflects substantial compliance with Program Statement 5270.09, Inmate Discipline Program. The decision of the DHO was based upon the greater weight of the evidence, and the sanctions imposed were consistent with the severity level of the prohibited act. The sanctions imposed were not disproportionate to your misconduct. Accordingly, your appeal is denied.

See (Doc. Nos. 1-1 at 6; 7-11 at 8).

Duru was "dissatisfied" with the Regional Director's response; as such, he filed an appeal from the Regional Director's decision to the BOP General Counsel/Central Office. See (Doc.

Nos. 1-1 at 4; 7-11 at 3). In this appeal, Duru challenged his disciplinary decision and sanctions as follows:

> I am dissatisfied with the Regional Director's decision (see BP-10) and now timely [sic] filing a Central Office Administrative Remedy (BP-11). I assert that I was using the bathroom during Allenwood's [l]ockdown (see date of incident). The Officer's (Mr. Thomas) [sic] memorandum claims that I was a person "engaging or participating" in a group demonstration (see charged offense code 212)[.] I assert I never placed any object (i.e. food) in a common area and never abandoned any property issued to me in a hallway. The institution staff Lt. Stover) claims there is no documentation (video surveillance) available. . . .
>
> Allenwood's "Lights on" policy is documented in the ASO handbook as 6:00 am. The video documentation should be available for review. I believe the video documentation should be submitted as evidence to counter the staff's statement and it should be given a [sic] serious consideration.
>
> I assert to have never engaged in a group demonstration as charged. My statement was never considered, as the decision was made prior to the meeting. I also found that the officers that were assigned to the unit for the night shift were Officer Deer and Officer B. Caronway. The morning shift don't come in until at least 7:00am and the said incident happened around 6:00am. No one that I have asked seem to know who Officer Thomas is and claim they never saw him in the unit on that day. I still don't know how he saw me or where he saw me. I only left my cube to the [sic] bathroom to freshen up and brush my teeth just like many other people did, and we were allowed to do that during the [l]ockdown.
>
> I am currently on direct appeal and have not been able to follow up on my case because communication with my attorney has been drastically reduced and almost non-existent due to the decision and punishment imposed on me, which is preventing me of my right to follow up on the due process.
>
> I have family and sick parents outside the country that I have not been able to communicate with since this began. And also a thirty one (31) months old son I haven't been able to check on for almost four months now.

See (Doc. Nos. 1-1 at 5; 7-11 at 9, 10, 11, 12).

On May 15, 2024, the BOP's Administrator for National Inmate Appeals denied Duru's appeal. See (Doc. Nos. 1-1 at 3; 7-11 at 2). This denial stated:

> You appeal the December 7, 2023, decision of the [DHO] regarding incident report #3860357 in which you were found to have committed the prohibited acts of

> Encouraging others to Engaging in a Group Demonstration (Code 212). You make no specific request for relief.
>
> Our review of your disciplinary proceedings indicates compliance with Program Statement 5270.09, Inmate Discipline Program. The DHO's decision was based upon the evidence detailed in Section V of the DHO report. We find the determination of the DHO is reasonable and supported by the evidence. Your Due Process rights were upheld during the discipline process. The sanctions imposed were commensurate to the severity level of the offense committed and in compliance with policy. We find no further relief is warranted.

See (Doc. Nos. 1-1 at 3; 7-11 at 2).[8]

## II. LEGAL STANDARDS

### A. Section 2241 Habeas Petitions

Section 2241 confers federal jurisdiction over a habeas petition that has been filed by a federal inmate challenging "not the validity but the execution of [their] sentence." See Cardona v. Bledsoe, 681 F.3d 533, 535 (3d Cir. 2012) (citations and footnote omitted); Woodall v. Fed.

---

[8] Duru attaches a document to his petition which appears to be an appeal from the Central Office's decision denying his appeal. See (Doc. No. 1-1 at 1). In this document, which is dated June 10, 2024, Duru stated:

> In response to your decision on my previously submitted BP-11 . . . and your reason for the denial[,] I am formally requesting the reversal of the unjust and unfair judgment that was imposed on me without any factual and material evidence connecting me to the incident I was accused of being a part of. I want this incident report and shot expunged from my record and all my privileges restores in accordance with that of other inmates. These includes [sic]: My phone, email, commissary, visits and 81 (eighty one) good days. I have a child and sick parents. And at the time of writing this on 6/10/24 [at] about 3:40pm[,] I received a letter informing me of my dad's passing on 6/3/2024. I have not communicated with them in over seven months and I know how much that contributed to his decline in health and ultimately his demise. Thank you for your consideration and compassion.

See (id.). There is no indication from the parties' submissions that Duru ever received a response to this submission or that the BOP received it. See (Doc. No. 7-10 (listing Duru's filed administrative remedies)).

Bureau of Prisons, 432 F.3d 235, 241 (3d Cir. 2005) (stating that Section 2241 "allows a federal prisoner to challenge the 'execution' of his sentence in habeas"). While "the precise meaning of 'execution of the sentence' is hazy[,]" the phrase has been interpreted as to "put into effect" or "carry out." See Woodall, 432 F.3d at 242, 243 (citation omitted). As a result, a federal inmate may challenge conduct undertaken by the BOP that affects the duration of the inmate's custody. See, e.g., Barden v. Keohane, 921 F.2d 476, 478–79 (3d Cir. 1990) (finding that a federal inmate's Section 2241 petition is actionable where the inmate attacks the term of their custody by challenging the way the BOP is computing their federal sentence).

**B. Due Process Claims Relating to Prison Disciplinary Proceedings**

"[P]rison disciplinary proceedings are not part of a criminal prosecution and the full panoply of rights due a defendant in such proceedings does not apply."[9] Wolff v. McDonnell, 418 U.S. 539, 556 (1974). As such, a prisoner is entitled to the following minimum procedural due process rights when accused of misconduct in prison which may result in the loss of GCT: (1) the right to appear before an impartial decision-making body; (2) twenty-four hour advance written notice of the disciplinary charges; (3) an opportunity to call witnesses and present documentary evidence in their defense when it is consistent with institutional safety and correctional goals; (4) assistance from an inmate representative if the charged prisoner is illiterate or complex issues are involved; and (5) a written decision by the fact finder of the evidence relied upon and the rationale behind the disciplinary action. See id. at 563–67.

[9] Liberty interests protected by the Fifth Amendment may arise either from the Due Process Clause itself or from statutory law. See Torres v. Fauver, 292 F.3d 141 (3d Cir. 2002). Nevertheless, there can be a liberty interest at stake in disciplinary proceedings in which an inmate loses GCT. See id. Since Duru's sanctions included the loss of GCT, he has identified a valid liberty interest in this matter for due process purposes.

The standard of review concerning the sufficiency of the evidence is whether there is "any evidence in the record that could support the conclusion reached by the disciplinary board." See Superintendent v. Hill, 472 U.S. 445, 455–56 (1985). This standard "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." See id. at 455. Instead, if there is "some evidence" to support the decision of the hearing examiner, the district court must reject any evidentiary challenges by the petitioner. See id. at 457. Overall, judicial review of a prison disciplinary decision is limited to ensuring that the prisoner was afforded certain procedures, the action against them was not arbitrary, and that the ultimate decision has some evidentiary support. See id.

## III. DISCUSSION

### A. The Parties' Arguments

As indicated above, Duru raises four challenges to his disciplinary proceedings in the petition. See (Doc. No. 1 at 6–7). First, he asserts that prison officials intentionally ignored video footage of the November 30, 2023 incident. See (id. at 6). Second, he alleges that an "Officer Thomas" from FCI Allenwood "is a fictitious and false witness." See (id.). Third, he contends that his sanctions unfairly restricted his access to his counsel assisting him with his direct appeal. See (id.). Fourth, and finally, he complains that he was denied a courtesy phone call after learning that his father had passed away, and he was injured by a zip-tie which was used on him during the November 30, 2023 incident. See (id. at 7).

Respondent contends that the Court should deny Duru's petition because he received all the process he was due and his claims lack merit. See (Doc. No. 7 at 5–10). Respondent asserts that Duru received sufficient notice of the charges against him, had an opportunity to call witnesses and present evidence in his own defense, and received a written statement from the

DHO identifying the evidence in support of their decision. See (id.). Respondent also argues that the DHO properly documented "some evidence" to support their findings, namely, "the Incident Report, investigation, photographs, staff memorandums [sic], and Duru's statement . . . ." See (id. at 9). Respondent further contends that the DHO imposed sanctions in accordance with BOP policy. See (id. at 10–12).

In his reply brief, Duru first addresses the lack of video evidence. He argues that although he "requested a review of the camera system to the multiple staff [sic] [he] encountered in the Special Housing Unit (SHU) and specifically the DHO Officer, [his] requests were deliberately ignored." See (Doc. No. 8 at 1). He asserts that the DHO Officer "lied by saying [Duru] never requested the review of the camera system" and "stopped [him] while [he] was making a statement." See (id.). Duru claims that a female staff member was present when this occurred. See (id.).

As for Officer Thomas, Duru states that he "requested the authentication and provision [sic] [of O]fficer Thomas to the DHO . . . and at every level of [his] appeal process," only to have his request "ignored and only acknowledged now at the 2241 level with a memorandum that lacks credibility and [is] littered with false assertions as it pertains to my person being involved." See (id.). Duru argues that he "never encountered . . . [O]fficer Thomas, neither was [he] given an instruction, nor did [he] hear him or her issue such or any instruction to anyone else." See (id. at 1–2). Moreover, he posits that the lack of available camera footage from the incident (at least according to Lt. Stover) "gives them room . . . to create a false entity in the name of [O]fficer Thomas to be a false witness of the incident in order to cover up their malicious intent and actions." See (id. at 2).

### B. Analysis[10]

#### 1. Duru's Challenge to the DHO's Decision That He Violated Code 212

The Court concludes that Duru is not entitled to habeas relief on his challenge to the DHO's decision that he violated Code 212. Perhaps understandably, Duru does not acknowledge that "this [C]ourt's role is limited to determining whether 'some evidence' exists in the record to support the DHO's decision; the [C]ourt does not reassess the evidence, take new evidence, or evaluate witness credibility." See Bennett v. Warden of LSCI Allenwood, No. 20-cv-01183, 2021 WL 1391785, at *4 (M.D. Pa. Apr. 13, 2021) (citations omitted). In other words, "[a]scertaining w whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the [DHO]." See Hill, 472 U.S. at 455–56.

In this case, the applicable standard guts Duru's arguments because the Court's inquiry here is limited to determining whether there was some evidence supporting the DHO's decision. The Court is not here to determine whether, inter alia, Officer Thomas is an actual person, Lt. Stover misrepresented whether there was conclusive video evidence of the incident, or the DHO

---

[10] The Court's analysis will be limited to whether the DHO relied upon sufficient evidence in finding Duru responsible for the disciplinary infraction and whether the DHO's sanctions were commensurate to the offense because Duru does not argue that his disciplinary proceedings otherwise violated his due process rights. In other words, he does not contend that, inter alia, he failed to receive written notice of the charge against him, he lacked an opportunity to call witnesses and present evidence in his own defense, or the DHO failed to provide him with a written statement of the evidence they relied upon in reaching their decision. However, even if Duru challenged these aspects of his disciplinary proceedings, his arguments would lack merit as the record shows that he received adequate and timely notice of the charge against him, he had an opportunity to call witnesses and present evidence in his own defense, and the DHO supplied him with a written statement identifying the evidence the DHO relied upon in concluding that he violated Code 212. See (Doc. Nos. 1-1 at 9-14; 7-4, 7-6–7-8).

and other prison officials misrepresented that Duru did not ask for a review of the video surveillance.[11]

Applying this standard here, the Court concludes that there was "some evidence" to support the DHO's decision in this case. In particular, the DHO relied upon, inter alia, Lt. Stover's memorandum indicating that the video surveillance was inconclusive as well as Officer Thomas's memorandum stating that he was physically present when the group demonstration occurred and identified Duru as one of the inmates participating in the group demonstration. See (Doc. Nos. 1-1 at 13; 7-8 at 4). Accordingly, Duru's challenge to the DHO's decision that he violated Code 212 lacks merit because there was evidence in the record to support the DHO's decision. See Hill, 472 U.S. at 455–56 (explaining that "some evidence" standard is satisfied where "there is any evidence in the record that could support the conclusion reached by the [DHO]").

**2. Duru's Challenge to the DHO's Sanctions**

Although the Court previously dismissed Duru's challenges to the sanctions imposed except to the extent that he complained of the loss of GCT, see (Doc. No. 5 at 5), the Court also construed the petition as containing a claim that the DHO imposed an excessive sanction. To the

[11] To credit Duru's assertion about Officer Thomas's existence or, more appropriately, lack of existence, would require the Court to believe that prison officials at FCI Allenwood Low created a Senior Officer Specialist ("SOS") Thomas, draft a memorandum on Officer Thomas's behalf and direct said memorandum to a Lieutenant (Kerstetter), and then sign the memorandum, see (Doc. No. 7-9 at 1), merely for the purpose of charging Duru with a Code 212 violation. As for Duru's dispute about whether he sought review of video footage of the incident, although he advocated in his appeals for a review of the footage, at no point did he assert that the investigating prison officials or the DHO lied or otherwise incorrectly noted that he did not request a review of the video surveillance. See (Doc. Nos. 1-1 at 1–14; 7-11 at 2–19). Also, although ultimately impertinent to the Court's analysis, Respondent submitted as an exhibit a sworn declaration from the DHO in which he attests that "Duru did not request that [he] review the video surveillance." See (Doc. No. 7-2 ¶ 29).

extent that Duru intended to assert such a claim, it lacks merit, as the DHO sanctions were supported by BOP policy.

As Respondents note in their response, a Code 212 violation involves a "High Severity Level Prohibited Act[]," for which the following sanctions can be imposed:

> A. Recommend parole date rescission or retardation.
>
> B. Forfeit and/or withhold earned statutory good time or non-vested good conduct time up to 50% or up to 60 days, whichever is less, and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).
>
> B.1 Disallow ordinarily between 25% and 50% (14-27 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).
>
> B.2 Forfeit up to 27 days of earned FSA Time Credits for each prohibited act committed.
>
> C. Disciplinary segregation (up to 6 months).
>
> D. Make monetary restitution.
>
> E. Monetary fine.
>
> F. Loss of privileges (e.g., visiting, telephone, commissary, movies, recreation).
>
> G. Change housing (quarters).
>
> H. Remove from program and/or group activity.
>
> I. Loss of job.
>
> J. Impound inmate's personal property.
>
> K. Confiscate contraband.
>
> L. Restrict to quarters.
>
> M. Extra duty.

See 28 C.F.R. 541.3. Here, all the sanctions imposed by the DHO were consistent with the severity level of the prohibited act and within the maximum available to the DHO. Accordingly,

Duru's challenge to the DHO's sanctions are meritless, and the Court will deny his Section 2241 petition.

## IV. CONCLUSION

For the reasons stated above, the Court will deny Duru's Section 2241 habeas petition and direct the Clerk of Court to close this case. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania